**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CAROLYN R.,

              Plaintiff,

     v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

              Defendant.

Case No. 22 C 1519

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Carolyn R. seeks to overturn the Commissioner of Social Security Administration's decision denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. Carolyn has filed a brief requesting reversal of the ALJ's decision and remand, and the Acting Commissioner's response brief seeks an order affirming the decision. For the reasons discussed below, the Court affirms the ALJ's decision.

## I. BACKGROUND

Carolyn filed her DIB and SSI applications on May 30, 2019, alleging an onset date of March 13, 2019. Carolyn was 56 years old at the time of her hearing before the ALJ and suffers from several physical and mental impairments. Specifically, Carolyn claims her cervical radiculopathy, depression, anxiety, costochondritis, osteoarthritis, fraying of the supraspinatus and infraspinatus, and disorder of the left rotator cuff prevent her from working. There is no medical documentation of impairment in Carolyn's dominant right upper extremity. Carolyn completed high school and two years of college courses at a junior college but did not receive

a college degree. She has worked in the past as an administrative assistant and an administrative coordinator.

The administrative law judge ("ALJ") issued a written decision on June 21, 2021, denying Carolyn's applications. (R. 13-27). The ALJ concluded that Carolyn's osteoarthritis and partial rotator cuff tear of the left shoulder and cervical spine degenerative disc disease were severe impairments but did not meet or equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 15-16, 19. The ALJ found Carolyn's depression and anxiety to be non-severe. *Id*. at 16-19. Under the "Paragraph B" analysis, the ALJ found that Carolyn had mild limitations in the four functional areas of understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. *Id*. at 17-18. The ALJ then determined that Carolyn had the residual functional capacity ("RFC") to perform a reduced range of light work except she can: (1) occasionally push and pull arm and operate hand controls with left (non-dominant) upper extremity; (2) occasionally reach overhead with her left upper extremity; (3) occasionally climb ladders, ropes, or scaffolds; and (4) occasionally crawl. *Id*. at 19. Given this RFC, the ALJ concluded that Carolyn was not disabled because she is capable of performing her past relevant work as an administrative clerk and a secretary. *Id*. at 26-27.

## II. DISCUSSION

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, *see* 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is unable to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)[1]; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford*, 227 F.3d at 868 (quotation marks omitted).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, --- U.S. ----, 139 S.Ct. 1148, 1154 (2019) (quotation marks omitted). In reviewing an ALJ's decision, the Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (quotation marks omitted). Nevertheless, where the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

In support of her request for reversal and remand, Carolyn argues that the ALJ: (1) erred in rejecting the opinions of her treating psychologist; (2) erred in finding her depression and

---

[1] Since the regulations governing DIB (20 C.F.R. § 404.1501 et seq.) and SSI (20 C.F.R. § 416.901 et seq.) are essentially the same, the Court cites only to the DIB regulations. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case.").

anxiety to be non-severe impairments; (3) made a flawed RFC assessment; and (4) erred in discrediting her subjective symptom statements. The Court finds that the ALJ's decision is supported by substantial evidence.

## A.    Treating Psychologist Opinion Evaluation

Carolyn first challenges the ALJ's decision to reject the opinions of her treating psychologist, Giries Sweis, Psy.D. The ALJ's evaluation of the medical opinion evidence was governed by 20 C.F.R. § 404.1520c. Under that regulation, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ need only articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [a claimant's] case record." 20 C.F.R. § 404.1520c(b). The regulations direct the ALJ to consider the persuasiveness of medical opinions using several listed factors. *See* 20 C.F.R. § 404.1520c(a), (c). Supportability and consistency are the two most important factors, and an ALJ must explain how she considered those factors in her decision. 20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2). An ALJ is not required to explain how she considered the other factors. 20 C.F.R. § 404.1520c(b)(2).

On June 19, 2020, Dr. Sweis completed a "Mental Impairment Questionnaire (RFC and Listings)" Report ("MIQ"). (R. 526-28). Dr. Sweis listed Carolyn's diagnoses as major depression, recurrent, severe, generalized anxiety disorder, and insomnia. *Id*. at 526. He identified Carolyn's signs and symptoms as poor memory, sleep disturbance, decreased energy, mood disturbance, difficulty thinking or concentrating, social withdrawal or isolation, feelings of guilt, generalized persistent anxiety, suicidal ideation, and anhedonia or pervasive loss of interests. *Id*. His clinical findings were anxiety and depressed mood and passive suicidal ideation that is chronic.

4

*Id.* With respect to mental abilities and aptitudes needed to do unskilled work, Dr. Sweis opined that Carolyn had a moderate limitation in her ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) make simple work-related decisions; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (5) respond appropriately to changes in a routine work setting; and (6) travel in unfamiliar places or use public transportation. *Id.* at 527.[2] With respect to the other eleven mental abilities needed to do unskilled work, Dr. Sweis found mild limitations in Carolyn's abilities. *Id.*[3] Dr. Sweis opined that Carolyn's symptoms would interfere with the attention and concentration needed to perform even simple tasks 21% or more during a typical workday. *Id.* at 528. Dr. Sweis then rated Carolyn in the four functional limitations of Paragraph B and concluded that Carolyn suffered from moderate limitations in understanding, remembering, or applying information, interacting with others, and adapting or managing oneself and marked limitations in concentration, persistence, or maintaining pace. *Id.*

Almost a year later, on May 7, 2021, Dr. Sweis completed another MIQ. (R. 621-23). Dr. Sweis noted that in response to treatment, Carolyn had improved mildly with her mood. *Id.* at 622. Regarding mental abilities and aptitudes needed to do unskilled work, Dr. Sweis opined that Carolyn was markedly limited in her ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance, and be

---

[2]     The form defined "moderate" as "[t]here is more than a slight limitation in this area but the individual is still able to function satisfactorily." (R. 527).

[3]     The form provided the following definition of mild: "[t]here is a slight limitation in this area, but the individual can generally function well." (R. 527).

5

punctual within customary tolerances; (3) work in coordination with or proximity to others without being unduly distracted by them; (4) make simple work-related decisions; (5) complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; (6) interact appropriately with the general public; (7) accept instructions and respond appropriately to criticism from supervisors; (8) get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; (9) travel in unfamiliar places or use public transportation; and (10) set realistic goals or make plans independently of others. *Id*.[4]  It was Dr. Sweis' opinion that Carolyn was moderately limited in her ability to: (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) sustain an ordinary routine with special supervision; (4) ask simple questions or request assistance; (5) respond appropriately to changes in a routine work setting; and (6) be aware of normal hazards and take appropriate precautions. *Id*.  Dr. Sweis further opined that Carolyn was mildly limited in carrying out very short and simple instructions. *Id*.  In addition, Dr. Sweis opined that Carolyn would miss work more than three times a month and her mental health symptoms would interfere with her attention and concentration to perform even simple work tasks 21% or more of work time. *Id*. at 622-23.  Dr. Sweis concluded that Carolyn had moderate limitations in understanding, remembering, or applying information and adapting or managing herself, marked limitations in concentration, persistence, or maintaining pace, and marked to extreme limitations in interacting with others. *Id*. at 623.[5]

---

[4]     "Marked" means "[t]here is a serious limitation in this area.  There is a substantial loss in the ability to effectively function." (R. 622).

[5]     "Extreme" is defined as "the inability to function in this area independently, appropriately, effectively, and on a sustained basis." (R. 623).

Carolyn argues that the ALJ improperly discounted these opinions from Dr. Sweis. First, the ALJ determined that Dr. Sweis' initial opinion was not persuasive because it was internally inconsistent. (R. 24). Specifically, the ALJ reasoned that Dr. Sweis found only mild to moderate limitations in Carolyn's work abilities but indicated moderate to marked limitations in the functional domains. *Id.* The ALJ's finding is supported by substantial evidence. In his MIQ opinion, Dr. Sweis only noted at most moderate limitations for work-related activities, but found a marked limitation in concentration, persistence, or pace. *Id.* at 527-28. Second, the ALJ noted that while it was unclear whether Dr. Sweis had seen Carolyn's prior therapy records, Dr. Sweis' opinion was not consistent with the other medical evidence showing that Carolyn's attention, focus, memory, behavior, and ability to participate in treatment was essentially unremarkable.[6] *Id.* at 24-25. The ALJ's conclusion is amply supported by the record. For example, the ALJ considered that the treatment notes of Carolyn's primary care provider, Dr. Modupe Oladeinde, do not note cognitive issues affecting Carolyn's abilities to understand, remember, or apply information or concentrate, persist, or maintain pace and May 2021 psychiatric records note that

---

[6]     Carolyn makes much of the fact that the ALJ did not specify which "therapy records" in the file might not have been available for Dr. Sweis to review and suggests the ALJ could have recontacted Dr. Sweis. The ALJ properly considered whether there was evidence showing that Dr. Sweis "ha[d] familiarity with the other evidence in the claim" when weighing Dr. Sweis' opinion. 20 C.F.R. § 404.1520c(c)(5). In any event, based on the ALJ's further explanation of her point, the ALJ clearly meant that Dr. Sweis' opinion was inconsistent with other medical evidence in the record. (R. 24-25). Contrary to Carolyn's assertion, the ALJ was not required to recontact Dr. Sweis to seek clarification on this matter where she did not find the overall evidence insufficient to make a disability determination. 20 C.F.R. § 404.1520b(b)(2) ("[I]f after considering the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency. . . . We may recontact your medical source."); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("[A]n ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled.").

Carolyn had intact memory and fair attention and concentration. *Id*. at 17-18 (citing *id*. at 390, 399, 404, 410, 415-16, 641, 649).[7]

Carolyn suggests that the ALJ's reliance on her primary care record cannot constitute substantial evidence to discount the opinion of her treating psychologist, citing *Wilder v. Chater*, 64 F.3d 335 (7th Cir. 1995). Doc. 22 at 5. In *Wilder*, the Court held that the ALJ improperly rejected a psychiatrist's opinion about the onset of the claimant's disabling depression because her medical records did not mention depression or other mental illness. *Wilder*, 64 F.3d 336-37. The Seventh Circuit reasoned that the "medical records were of purely physical ailments for which Wilder had sought help, and there is no reason to expect a doctor asked about an eye problem, or a back pain, or an infection of the urinary tract to diagnose depression. He is not looking for it, and may not even be competent to diagnose it." *Id*. at 337. This case is distinguishable from *Wilder* because Dr. Oladeinde's records did not address only "purely physical ailments." In addition to treating Carolyn's physical conditions, Dr. Oladeinde diagnosed Carolyn's depression, prescribed an antidepressant (Sertraline), and routinely assessed her psychiatric condition. (R. 399-401, 404, 406-07, 410-11, 416-17, 641). As the ALJ found, it is reasonable to expect that Dr. Oladeinde would document concerns about Carolyn's mental functioning. Thus, Dr. Sweis' first "opinion as to [Carolyn's] limitations was internally inconsistent—as well as inconsistent with objective

---

[7]    Third, the ALJ discounted Dr. Sweis' opinion because it was offered "shortly after [Carolyn] began psychotherapy, having only had three prior sessions." (R. 24). The Commissioner concedes that Dr. Sweis' limited treatment history, standing alone, was not a valid reason for crediting the non-examining state agency psychological consultants' opinions over Dr. Sweis' opinion. Doc. 21 at 11; *see Paul v Berryhill*, 760 F. App'x 460, 464 (7th Cir. 2019). However, any error in the ALJ's rejection of Dr. Sweis' first mental opinion limitations based in part on the limited treatment history was harmless because the other independent reasons the ALJ gave for discounting the opinion were valid and supported. *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009) ("[A]ny error here was harmless given the other reasons the ALJ cited for discounting Dr. Callier's opinions.").

medical evidence in the record—so the ALJ was entitled to give his opinion less weight." *Prill v. Kijakazi*, 23 F.4th 738, 751 (7th Cir. 2022).

Regarding Dr. Sweis' second opinion, the ALJ found Dr. Sweis' opined moderate to marked limitations in nearly every mental area unpersuasive because that assessment was inconsistent with Dr. Sweis' own exam findings and inconsistent with the objective medical evidence in the record and conservative course of mental health treatment. (R. 25). The ALJ also found Dr. Sweis' opined restrictions inconsistent with Carolyn's reported activities, including watching television, doing crafts, and caring for her personal needs. *Id.*

The ALJ's finding as to Dr. Sweis' second opinion is supported by substantial evidence. Dr. Sweis' mental status exams do not mention significant difficulties maintaining concentration or in interacting with others. Despite her mood being described as depressed, anxious, and irritable, Carolyn had mostly unremarkable mental status health findings with good attention/concentration:

> June 3, 2020 - alert and oriented x 3; speech: talkative; mood: anxious; thought process: anxiety/worry; thought content: safety and security as well as health; attention/concentration: good; memory: intact; insight: fair to poor; judgment: fair. (R. 693).

> December 9, 2020 – alert and oriented x 3; speech: normal rate, tone, and volume; mood: depressed, anxious, irritable; thought process: logical and coherent; thought content: no delusions or paranoia endorsed; memory: intact; insight: fair; judgment: fair. *Id*. at 683.

> March 2, 2021 – alert and oriented x 3; speech: soft-spoken; mood: depressed, anxious; thought process: logical and coherent; thought content: no delusions or paranoia endorsed; attention/concentration: good; memory: intact; insight: fair; judgment: fair. *Id*. at 672.[8]

---

[8]    In ordinary usage, "fair" does not mean "bad" or "inadequate." *Pavlicek v. Saul*, 994 F.3d 777, 783 (7th Cir. 2021).

In short, there is no evidence in Dr. Sweis' mental status exam findings to support his conclusion that Carolyn has attention and concentration issues that seriously limit her functioning in that area and social interaction issues that seriously limit to prevent functioning in that area. As such the ALJ's finding that Dr. Sweis' opinion was not persuasive because it was not consistent with his own exam findings is well-supported.

The ALJ's second reason for discounting Dr. Sweis' most recent opinion was that his findings were not consistent with the objective record as a whole showing conservative treatment for Carolyn's mental impairments. "Medical opinions may be discounted if they are inconsistent with the record as a whole." *Chambers v. Saul*, 861 F. App'x 95, 101 (7th Cir. 2021); 20 C.F.R. § 404.1520c(c)(2) ("[t]he more consistent a medical opinion . . . is with the evidence from other medical sources . . . in the claim, the more persuasive the medical opinion(s) . . . will be."). Moreover, "the Seventh Circuit has held that it is reasonable for an ALJ to consider a claimant's conservative treatment." *Anthony G. v. Saul*, 2020 WL 439964, at \*10 (N.D. Ill. Jan. 28, 2020).

The ALJ's conclusion that Dr. Sweis' second opinion is inconsistent with the objective evidence in the record and Carolyn's course of treatment is supported by the record. For example, although her primary care physician, Dr. Oladeinde, diagnosed Carolyn with depression on June 25, 2019, his mental status evaluations on June 25, 2019, July 16, 2019, November 12, 2019, March 11, 2020, and October 8, 2020 showed Carolyn had normal mood/affect, normal judgment, and was non-suicidal. (R. 399, 404, 410, 416, 641). Further, the ALJ noted that treatment notes of Carolyn's psychiatrist, Dr. Samina Khattak, in May 2021 (the last treatment note in the record) found that despite depressed and anxious mood and affect, Carolyn remained cooperative; her memory was intact; she had fair attention and concentration; her judgment and insight were fair; and her thought content was normal. *Id*. at 17-18 (citing *id*. at 649).

10

The ALJ also referenced the December 2019 psychological consultative examination, where Michelle Krucek, Psy.D., includes a mental status assessment of Carolyn indicating that: she had appropriate eye contact, clear speech, and a cooperative attitude; she was fully oriented; her appearance was without concern; she denied visual or auditory hallucinations; she did not appear to be responding to external or interna stimuli; and she denied suicidal or homicidal ideation. (R. 18, 488, 490). The ALJ pointed out that although Carolyn did not recall her appointment time, she correctly stated the current U.S. President, named two prior U.S. Presidents out of five, named five large U.S. cities, recalled one object after a one- and five-minute delay, repeated a series of five numbers forward and three numbers backward, successfully calculated serial sevens, and was deemed able to manage her own funds. *Id*. at 17-18, 490-91.

In addition, the ALJ considered that Dr. Sweis' second opinion was not consistent with Carolyn's conservative course of mental health treatment consisting of therapy and a medication regime of Sertraline, Clonazepam, and then Wellbutrin. (R. 16, 25). The ALJ pointed to specific evidence showing the Carolyn's mental health treatment was conservative. For example, the ALJ noted that Carolyn attended therapy for her depression and anxiety symptoms in 2016 and 2017, which was well before the alleged onset date of March 13, 2019, but did not receive further therapy until March 2020 and had only had one psychology appointment by May 2020, despite receiving the psychology referral in June 2019.[9] (R. 16-17, 23); *Summers v. Colvin*, 634 F. App'x 590, 592 (7th Cir. 2016) ("the ALJ's mention of the gaps in treatment was related to his point that the treatment Summers did receive was conservative"). The ALJ specifically considered that

---

[9]     The ALJ incorrectly stated in this part of the decision that Carolyn began seeing Dr. Sweis in June 2020. (R. 23). Earlier in her decision, the ALJ correctly noted that Carolyn began seeing Dr. Sweis in March 2020. *Id*. at 17, 526, 621.

Carolyn's individual counseling sessions with Dr. Sweis continued for "about four sessions." (R. 16-17).

While Carolyn disputes that the treatment record of limited counseling sessions and medication management with symptom improvement should be characterized as conservative, the ALJ's view of Carolyn's treatment history is not unreasonable. Doc. 15 at 10-11; *see Chambers*, 861 F. App'x at 101 (ALJ properly discounted opinions of treating therapist and treating psychiatrist as inconsistent claimant's "relatively conservative" treatment of weekly psychotherapy sessions, medication management with a psychiatrist, and when she reported thoughts of self-harm and worsening depression, was neither prescribed a significantly more aggressive treatment plan nor admitted to a hospital). The ALJ also "permissibly noted that [Carolyn] did not require more intensive care [] and that her symptoms improved with medication."[10] *Diaz v. Kijakazi*, 2023 WL 5275905, at *2-3 (7th Cir. 2023) (upholding ALJ's partial discounting of examining psychologist's opinion where ALJ found psychologist's assessment inconsistent with claimant's improved symptoms while taking medication, generally good mental status examinations, and relatively conservative treatment (day-treatment program was recommended but she had not needed to be hospitalized). The ALJ explained that there was no evidence of any emergency room treatment or psychiatric admissions for exacerbated mental symptoms or any recommendations for inpatient admissions, partial hospitalization program

---

[10]    *See* (R. 16-17, 23); *id.* at 418 (5/21/2020: after having been on the same Sertraline dosage (100 mg) for six months, Carolyn reported Sertraline has "been helping," not crying like before, mood improved, and no suicidal thoughts or ideas.); *id.* at 634 (1/5/2021: primary care physician noted that Carolyn's depression was "improving" and advised her to continue to follow with her psychologist); *id.* at 662 (3/23/2021: Carolyn reported to her psychiatrist at her initial appointment that her "increase in medication had helped some," but she complained of feeling anxious, depressed, hopeless and helpless and her voice trembling and she agreed to add Wellbutrin to her prescriptions); *id.* at 648 (5/6/2021: since starting new medication (Wellbutrin), Carolyn said that "she is doing good. . . . Feels that medication helps her as she used to be a lot worse").

(PHP), or intensive outpatient program (IOP). (R. 16, 23); *Diana S. v. Kijakazi*, 2022 WL 2316201, at *11 (N.D. Ill. June 28, 2022) (finding no error in ALJ's characterization of primary care doctor prescribing medications for anxiety and depression as conservative where "ALJ contextualized her finding that Claimant's treatment was conservative by comparing it to other treatment options— such as counseling, medication management via psychiatrist, intensive outpatient treatment, and psychiatric hospitalization."); *cf. Matthew Z. v. Kijakazi*, 2022 WL 580784, at *4 (N.D. Ill. Feb. 25, 2022) (ALJ improperly dismissed some of claimant's treating psychiatrist's opinions as inconsistent with his "conservative" treatment where psychiatrist repeatedly referred claimant to an IOP and even after claimant completed one IOP, psychiatrist continued to recommend IOP). Thus, substantial evidence (improvement with medication, overall unremarkable mental status exam findings, and the absence of more intensive mental health care) supports the ALJ's determination that Dr. Sweis' opinion of Carolyn's marked to extreme limitations were inconsistent with the record.[11]

Further, Dr. Sweis' second opinion conflicted with the conclusions of the state agency reviewing psychologists, who on reconsideration reviewed Dr. Sweis' first opinion (which included Dr. Sweis' opinion that Carolyn was markedly limited in concentration, persistence, or pace). The state agency psychological consultants, Jeanne Yakin, Ph.D. and Lionel Hudspeth, Psy.D., reviewed the evidence in December 2019 and December 2020, respectively. (R. 73-74, 101-03). Both Drs. Yakin and Hudspeth concluded that Carolyn's depression and anxiety were non-severe impairments and caused only mild limitations in all four functional domains. *Id.* The

---

[11] The Court also considers Carolyn's lack of hospitalization argument waived because she failed to raise it in her opening brief. (R. 22 at 5-6); *O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) ("[W]e have repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived."); *Frazee v. Berryhill*, 733 F. App'x 831, 835 (7th Cir. 2018) (claimant "sought to add more arguments in her district-court reply brief, but that was too late to avoid waiver.").

ALJ found these opinions persuasive because they comported with the overall record that showed "limited clinical findings on largely unremarkable mental status exams" and "rather minimal treatment, consisting mainly of [medication] management and only four therapy sessions" during the relevant period. *Id*. at 23-24.  The ALJ further noted that Carolyn's therapy sessions lasted 30 minutes or less and her two psychiatry appointments with Dr. Khattak were 21 minutes in length, with only 50 percent of the time spent counseling. *Id*. at 23-24, 647, 650, 656, 660, 671, 680, 690. Carolyn does not challenge the ALJ's reliance on the opinions of the state agency psychological consultants generally, but only that they did not review the entire record, which the Court discusses below and rejects.  The ALJ was entitled to rely on the opinions of Drs. Yakin and Hudspeth, who are "highly qualified [] experts in Social Security disability evaluation" and especially because she determined that their opinions were consistent with the objective medical record. 20 C.F.R. § 404.1513a(b)(1); *Prill*, 23 F.4th at 751.

Finally, the ALJ concluded that Dr. Sweis' second opinion was not consistent with Carolyn's reported activities. (R. 25).  An ALJ may properly consider a claimant's own reports regarding her activities of daily living when determining the weight to assign a treating physician's opinion. *Leon A. v. Kijakazi*, 2022 WL 3226822, at *10 (N.D. Ill. Aug. 10, 2022). Carolyn argues that the ALJ did not explain how her ability to watch television and perform self-care activities was inconsistent with Dr. Sweis' assessed limitations.  Carolyn's ability to watch television likely says little about her attention span, but the ALJ's conclusion is supported by other evidence in the record. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (expressing skepticism "that the ability to watch television for several hours indicates a long attention span.").  Carolyn lives independently in a house, takes care of her personal needs, prepares simple meals like sandwiches and frozen dinners using an air fryer or microwave, does laundry, takes care of her dog with help

14

from relatives, drives short distances, goes to the grocery store, shops by mail or online, pays bills and handles money, and socializes with her father and sister several times a week. (R. 245-248, 270-274, 290-294, 489). In addition, the ALJ noted that the record supports that Carolyn appropriately interacts with familiar and unfamiliar medical personnel, suggesting Dr. Sweis overstated Carolyn's social interaction limitations. *Id.* at 17-18; *Diaz*, 2023 WL 5275905, at *4 (in giving examining consulting psychologist's opinion little weight, the "ALJ permissibly noted that [claimant] regularly interacted appropriately with her treating physicians, who often described her as cooperative or pleasant . . . even when she otherwise had severe mental-health symptoms."). Thus, the ALJ conclusion that Carolyn's reports of her daily activities were inconsistent with Dr. Sweis' assessment that Carolyn was markedly restricted in her ability to concentrate, persist, or maintain pace and markedly or extremely limited in her ability to interact with others is supported by substantial evidence. In any event, even if the ALJ failed to adequately explain how Carolyn's activities do not support Dr. Sweis' second opinion, this would not be a basis for remand because the ALJ's rejection of Dr. Sweis' opinion is still supported by other valid reasons that are supported by substantial evidence, including the inconsistency of Dr. Sweis' opinion with his own mental status exam findings and the objective medical evidence. *Denise O.-B. v. Kijakazi*, 2023 WL 35179, at *3 (N.D. Ill. Jan. 4, 2023).

For all these reasons, the ALJ provided sufficient reasons for discounting Dr. Sweis' opinions which a reasonable mind could accept as supporting the ALJ's conclusion. *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022) (the court does "not review medical opinions independently but rather review[s] the ALJ's weighing of those opinions for substantial evidence," and only "overturn[s] that weighing if no reasonable mind could accept the ALJ's conclusion.").

15

**B.  Step Two Determination**

Carolyn next argues that the ALJ committed legal error by not finding that her mental impairments of depression and anxiety were severe impairments. (R. 16-18).  The Court finds that any error the ALJ may have made at step two was harmless.  "Step two is merely a threshold inquiry; so long as one of the claimant's limitations is found to be severe, error at that step is harmless." *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019); *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012).  Regardless of whether Carolyn's mental impairments were considered severe, "the ALJ must later consider the limitations imposed by all impairments, severe and non-severe." *Ray*, 915 F.3d at 492.  Accordingly, "any error at Step Two is harmless if the ALJ finds a claimant has *any* severe impairment and goes on to sufficiently address the aggregate effect of all the claimant's severe and non-severe impairments later in his analysis." *Dorothy B. v. Berryhill*, 2019 WL 2325998, at *2 (N.D. Ill. May 31, 2019) (emphasis in original).  Here, the ALJ found that Carolyn had other severe impairments—namely, osteoarthritis and partial rotator cuff tear of the left shoulder and cervical spine degenerative disc disease—and, as explained below, she addressed Carolyn's severe and non-severe impairments in crafting her RFC.  Accordingly, any error in finding her mental impairments non-severe at step two was harmless.

**C.  RFC Assessment**

Carolyn also contends that the ALJ erred in making her RFC determination.  The RFC is the "most physical and mental work the claimant can do on a sustained basis despite her limitations." *Madrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022).  In reaching her RFC assessment, the ALJ must "articulate at some minimal level her analysis of the evidence." *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).  Ultimately, an ALJ need only include

16

limitations in the RFC that are supported by the medical record. *Deborah M. v. Saul*, 994 F.3d 785, 791 (7th Cir. 2021).

Carolyn first objects that the ALJ did not include any mental restrictions in the RFC. "When determining a claimant's residual capacity to work, the ALJ must consider in combination all limitations on a claimant's ability to work, including those that are not individually severe." *Krug v. Saul*, 846 F. App'x 403, 406 (7th Cir. 2021). "Although a mild limitation in an area of mental functioning does not necessarily prevent an individual from securing gainful employment, the ALJ must still affirmatively evaluate the effect of that limitation on the claimant's RFC." *Judy D. v. Saul*, 2019 WL 3805592, at *4 (N.D. Ill. Aug. 13, 2019) (internal citation and quotation marks omitted).

At step two, the ALJ noted Carolyn's mental impairments of depression and anxiety and analyzed the relevant evidence. (R. 16-18). Consistent with the opinions of the state agency psychological consultants, the ALJ concluded that Carolyn had mild limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing herself. *Id.* at 17-18, 73-74, 101-03. In finding that her mental impairments caused no more than a mild limitation in the four areas of mental functioning, the ALJ considered Carolyn's statements that: her medication side effects affect her memory and ability to sleep at night causing zombie-like brain fogginess; she was unable to be around people or leave her home; her anxiety causes racing thoughts; and she has disabling panic attacks which occur a few times a week. *Id.* at 17-18. The ALJ noted Carolyn's limited and conservative mental health treatment, overall unremarkable mental health status exam findings by her primary care physician and psychiatrist, appropriate interaction with medical professionals,

and improvement with medication. *Id.* at 16-18. The ALJ also noted the findings from the December 2019 consultative psychological exam conducted by Dr. Krucek. *Id.* at 17-18.

The ALJ then considered Carolyn's non-severe mental impairments in determining her RFC and did not include any mental restrictions in the RFC. *Rick M. v. Saul*, 2021 WL 2588762, at *5 (N.D. Ill. June 24, 2021) (an ALJ is "required to *consider* [step two mild mental limitations], not necessarily to include them in his finding of plaintiff's RFC."). In her RFC assessment, the ALJ noted Carolyn's testimony that she spends most of the day in bed, her sister or father come three times a week to do her household chores, and she only arises from bed to care for her dog. (R. 20). The ALJ also noted Carolyn's testimony that she experiences panic attacks several times a week, including most recently right before her telephone hearing with the ALJ. *Id.* at 20, 23. The ALJ cited Carolyn's testimony that if she has something scheduled, such as a doctor's appointment, she has a panic attack. *Id.* at 20. The ALJ noted Carolyn claimed to have difficulty attending scheduled appointments due to such pain attacks. *Id.* The ALJ cited Carolyn's testimony that she had side effects from medication, particularly impacting her memory and ability to sleep at night, causing zombie-like brain fogginess. *Id.* at 23. The ALJ considered the objective medical evidence of record, including the minimal and conservative mental health treatment history, the gap in therapy treatment between 2017 and March 2020, the improvement of symptoms with medication, and the overall unremarkable mental health status examination findings *Id.* at 23. The ALJ found that the record contained no documented complaints of any side effects from prescribed medication. *Id.* The ALJ further found that Carolyn's alleged panic attacks at the hearing were unsupported by the medical record as there were no documented complaints of panic attacks in the record from the relevant time period. *Id.*

In assessing the RFC, the ALJ also evaluated the opinion evidence. The ALJ permissibly relied on the state agency psychological consultants—who reviewed Carolyn's record and found that her mental impairments caused a mild limitation in each of the four areas of mental functioning and were non-severe. (R. 23-24, 73-74, 101-103).[12] The state agency psychological consultants' non-severe assessment and mild Paragraph B findings were contradicted by Dr. Sweis' opinions, but as explained above, the ALJ did not err in rejecting Dr. Sweis' proposed limitations as inconsistent with the medical record. Carolyn points out that her primary care provider Dr. Oladeinde opined in a March 2020 Chronic Pain Residual Functional Capacity Questionnaire that she would frequently experience pain or other symptoms severe enough to interfere with her attention and concentration and she would be incapable of even "low-stress" work. *Id*. at 501-502. However, the ALJ rejected the opinion because it "failed to comport with [Dr. Oladeinde's] own objective concurrent findings," and Carolyn does not challenge that finding. *Id*. at 21. Based on this record, the ALJ supported her RFC without mental restrictions with more than a mere scintilla of evidence.[13]

Carolyn maintains that the ALJ erred in relying on the state agency psychologists' assessments because they were outdated in light of additional medical evidence submitted after those opinions were rendered. In particular, Carolyn points out that the state agency psychologists did not review: (1) Blue Sky Psychiatry records; (2) Stroger Hospital records; and (3) Dr. Sweis' second MIQ. The Seventh Circuit has held that "ALJs may not rely on outdated opinions of agency consultants if later evidence containing new, significant medical diagnoses reasonably could have

---

[12]     If the degree of limitation is rated as "none" or "mild" in all four areas, then the mental impairment generally is non-severe. 20 C.F.R. § 404.1520a(d)(1). A non-severe impairment "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a).

[13]     Consultative examiner Dr. Krucek did not include a functional assessment of Carolyn's abilities or opine about any limitations Carolyn's mental impairments may have caused.

changed the reviewing physician's opinion." *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018) (internal quotation marks and citation omitted). But "not all new evidence" following the state agency consultants' opinions will require a remand. *Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021); *Keys v. Berryhill*, 679 F. App'x 477, 481 (7th Cir. 2017) ("If an ALJ were required to update the record any time a claimant continued to received treatment, a case might never end."). The relevant question is "whether the new information changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of the subsequent report." *Kemplen*, 884 F. App'x at 887 (internal quotation marks and citation omitted). "Courts have found evidence following a state agency physician's review to be potentially decisive in situations where it reveals a new condition or reflects a severe worsening of a condition." *Shelia M. v. Saul*, 2021 WL 1784775, at *6 (N.D. Ill. May 5, 2021) (citing cases). Carolyn bears the burden of explaining how the new medical evidence undermines the opinions of the state agency psychologists. *Keys*, 679 F. App'x at 481.

Carolyn has not met her burden of showing that any of the evidence she mentions would have affected the state agency psychologists' assessment of her mental impairments. Doc. 15 at 8-9. The Blue Sky Psychiatry records cited by Carolyn contain her treatment notes with psychiatrist Priya Parmar, M.D., between August 1, 2016 and October 26, 2017. (R. 531-619). Carolyn points out that the Blue Sky Psychiatry records include: (1) an August 2016 note documenting her diagnosis of major depressive disorder, recurrent, severe, a notation that at that time she was searching for an IOP program, and had suicidal thoughts (*id*. at 550); (2) a May 2017 record indicating that she was having conflicts with coworkers with increased anxiety and agitation and her medications included Seroquel, Sertraline, Atenolol, and Clonazepam (*id*. at 592); and (3) references to anxiety problems and difficulty interacting with coworkers (*id*. at 588, 592, 596, 598,

616, 618).   As an initial matter, these treatment records do not address the relevant time period as they occurred at least 16 months prior to the alleged disability onset date of March 13, 2019. *Walter O. v. Kijakazi*, 2022 WL 2046269, at *5 (N.D. Ill. June 7, 2022) (MRI from three years prior to the initial state agency review was not new evidence).   Carolyn bore the burden of supplying adequate records to prove her disability claim, but she does not explain why these pre-onset records were not sought until May 12, 2021, less than a month before the June 4, 2021 before the ALJ. (R. 532-34); *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) ("claimant bears the burden of supplying adequate records and evidence to prove their claim of disability."); 20 C.F.R. § 404.1512(a)(1) ("You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled.").   Notably, Carolyn has been represented by counsel since January 27, 2020, which was almost eleven months before the state agency psychologist's review at the reconsideration stage on December 14, 2020. (R. 103, 138-40).   It is therefore reasonable to assume that Carolyn would have presented the Blue Sky Psychiatry records prior to the state agency's review on reconsideration if she believed they supported her application for benefits.

Second, Carolyn offers no explanation of how these pre-onset records would have changed the opinions of the state agency psychologists.  Carolyn does not identify any new diagnoses from Dr. Parmar's pre-onset notes.  Dr. Parmar's diagnosis of major depressive disorder, recurrent, severe is not a new diagnosis and her reference to suicidal thoughts and anxiety problems are not new conditions.   Dr. Sweis indicated diagnoses of "major depression, recurrent, severe" and "generalized anxiety disorder" with daily passive suicidal ideation in his first opinion, which the state agency psychologist reviewed on reconsideration. (R. 526).   Moreover, Carolyn's long history of depression and anxiety with suicidal thoughts prior to the alleged onset date was evident

in the medical record from the relevant time period. For example, in the consultative psychological examiner's report, which both state agency psychologists considered, Carolyn reported that she has "always had bouts of depression and anxiety" and could "recall in high school having suicidal thoughts." *Id.* at 74, 102, 489. Likewise, Dr. Sweis indicated in his first opinion that Carolyn's symptom onset was in her teenage years, which worsened in 2016, and his clinical findings were "anxiety and depressed mood, passive suicidal ideation[] that is chronic." *Id.* at 526. Furthermore, the ALJ acknowledged that Carolyn had a "longstanding reported history of mental health symptoms with ongoing symptoms due to stress (from lack of a job and financial issues) [with] [t]he record document[ing] therapy for depression and anxiety in 2016 and 2017, well prior the alleged onset date." *Id.* at 23. It is true that Dr. Parmar's initial treatment notes during August 2016 mentioned Carolyn researching IOP programs. *Id.* at 549, 550, 552, 553. But with medication treatment, by September and October 2016, Carolyn was feeling better with less crying and improved sleep and planning to return to work. *Id.* at 554, 556. In September 2016, Carolyn reported that she did not want to go to an IOP and there is no evidence that she attended an IOP. *Id* at 554. Finally, the records the state agency psychologists reviewed indicated that Carolyn was prescribed medications for her psychological symptoms. *Id.* at 74, 100, 401 (Sertraline), 406 (Sertraline), 411 (Sertraline), 417 (Sertraline), 489 (Sertraline, Trazadone, Clonazepam).

The unreviewed Stroger Hospital records and Dr. Sweis' second MIQ would also not have changed the state agency psychologists' opinions. The Stroger Hospital records contain Dr. Sweis' treatment notes from June 3, 2020, December 9, 2020, and March 2, 2021 and Dr. Khattak's treatment notes from March 23, 2021 and May 6, 2021.[14] (R. 646-705). According to Carolyn,

---

[14]     In addition, the Stroger Hospital records include the first two treatment notes of Dr. Manisha Ogale (family practice physician) on October 8, 2020 and January 5, 2021. (R. 629-645). On October 8, 2020, Dr. Ogale found Carolyn to be cooperative with normal mood and affect, normal judgment, and non-suicidal. *Id.* at 641. At the next appointment, Dr. Ogale's impression was Carolyn's depression was

the unreviewed medical records from Stroger Hospital indicate severe, daily depression and her mental condition worsening with feelings of guilt, hopelessness, fatigue, memory problem, sadness, and withdrawal. Doc. 15 at 8. But these treatment records do not contain new diagnoses that were unknown to Drs. Hudspeth who reviewed Dr. Sweis' June 19, 2020 opinion. Nor do these records reflect a severe worsening of Carolyn's condition but rather demonstrate similar continuing symptoms with mental status examination findings remaining fairly stable over multiple examinations during this period. Drs. Sweis and Khattak mostly documented fair mental status findings, and these findings were congruent with Dr. Sweis' moderate findings in his first opinion—findings which Dr. Hudspeth had before him when he issued his report. *Pavlicek*, 994 F.3d at 783 ("A "moderate limitation" is defined by regulation to mean that functioning in that area is 'fair.'").[15]

Further, Carolyn does not explain how Dr. Sweis' second MIQ would have altered the state agency psychologists' opinions. Doc. 15 at 8-9; Doc. 22 at 8-9. Dr. Sweis' second opinion does not contain new diagnoses or "entirely new symptoms" that were unknown to Dr. Hudspeth when he reviewed Dr. Sweis' first MIQ. Compare (R. 526) with (R. 621); *Pavlick*, 994 F.3d at 784. Moreover, in his first opinion, Dr. Sweis opined that Carolyn was markedly limited in concentration, persistence, or maintaining pace and moderately limited in the other three Paragraph B functional areas. (R. 95-96). In his second opinion, Dr. Sweis included similar findings of

---

"improving." *Id*. at 634. Because these records reflect normal mental status examination findings and improvement in Carolyn's depression, this evidence likely would not change the state agency psychologists' opinion that Carolyn's mental impairments were not severe and their findings of mild limitations in the Paragraph B functional areas.

[15]      *See* R. 649 (5/6/2021: attention/concentration: fair; memory: intact; insight: fair; judgment: fair); *id*. at 658 (3/23/2021: attention/concentration: fair; memory: intact; insight: fair; judgment: fair); *id*. at 672 (3/3/2021: attention/concentration: good; memory: intact; insight: fair; judgment: fair); *id*. at 683 (12/9/2020: memory: intact; insight: fair; judgment: fair); *id*. at 693 (6/3/2020: attention/concentration: good; memory: intact; insight: fair to poor; judgment: fair).

moderate limitations in understanding, remembering, or applying information and adapting or managing oneself and marked limitations in concentration, persistence, or maintaining pace as his first opinion. *Id*. at 528, 622-23. Thus, the ALJ already had an expert opinion evaluating Carolyn's ability in these areas and reasonably found the state agency reconsideration opinion persuasive after evaluating whether it was supported by and consistent with the evidence. *Id*. at 23-24. It is true that Dr. Sweis' second MIQ included markedly limiting restrictions in some mental abilities needed to do unskilled work and a marked to extreme limitation in interacting with others, but these stricter findings are wholly unsupported by his own treatment notes and the contemporaneous records from Dr. Khattak's treatment. As a result, they would not likely have changed Dr. Hudspeth's opinion. Consequently, Carolyn has failed to demonstrate that the ALJ committed reversible error by relying on the state agency psychologists' opinions in finding no mental limitations in the RFC.

Regarding the ALJ's physical RFC determination, Carolyn makes two arguments. Carolyn first argues that the ALJ erred by finding she could perform light work. Carolyn makes much of the fact that there is no opinion in the record finding that she could perform light work. Carolyn claims that the ALJ thus improperly constructed a "middle ground" finding after declining to adopt the state agency physicians' opinions for medium work and her treating physician's opinion of an inability to perform full-time work. For her second argument, Carolyn contends that the ALJ erred in failing to include greater restrictions in the use of her left upper extremity and lifting ability. The Court finds neither of these arguments warrants a reversal of the ALJ's decision.

The ALJ found the non-exertional limitations opinion from the state agency physician at reconsideration to only occasional left upper extremity pushing and pulling (including operation of hand controls), occasional overhead reaching with her left arm, and occasional climbing and

24

crawling to be persuasive. (R. 24).  The ALJ also found that opinions from the state agency physicians that Carolyn can perform medium work unpersuasive. *Id*.  The ALJ explained that she limited Carolyn to a reduced range of light work because at the time the state agency physician rendered his decision on reconsideration in December 2020, he did not have more recent medical records, particularly the Stroger Hospital records from June 3, 2020 to May 6, 2021.[16]  In these later records, Carolyn complained of left shoulder pain that had started about 3-4 months prior. *Id*. at 630.  As such, the ALJ gave Carolyn "all benefit of reasonable doubt in limiting her to a reduced range of light work" by including greater lifting restrictions. *Id*.

There is no error here.  An ALJ's "RFC assessment is not required to match the opinion of at least one physician of record." *Andrea H. v. Kijakazi*, 2023 WL 2403138, at *4 (N.D. Ill. March 8, 2023); *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (in determining RFC, an ALJ "must consider the entire record" and "is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians.").  "Rather, it is the role of the ALJ to resolve conflicts in the evidence and to formulate an appropriate RFC based on consideration of the entire record." *McReynolds v. Berryhill*, 341 F.Supp.3d 869, 880 (N.D. Ill. 2018).  Moreover, "[a]n ALJ may give a claimant the benefit of the doubt in assessing their symptoms and formulating their RFC limitations." *Brian C. Kijakazi*, 2023 WL 4564564, at *9 (N.D. Ill. July 17, 2023).[17]

---

[16]     The ALJ incorrectly stated that the state agency reconsideration decision was rendered in June 2020. (R. 24).

[17]     *See Taylor v. Kijakazi*, 2021 WL 6101618, at *3 (7th Cir. Dec. 22, 2021)("If anything, our review of the record shows that the ALJ gave Taylor the benefit of the doubt."); *Cervantes v. Kijakazi*, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021) ("The ALJ canvassed the medical evidence[,] [] fully accounted for Cervantes's physical and mental impairments, [and] gave Cervantes 'the benefit of the doubt' . . . ."); *Harris-Patterson v. Saul*, 835 F. App'x 130, 131 (7th Cir. 2021) ("the ALJ made it clear that he was giving Harris-Patterson the benefit of the doubt by treating her as needing 10 to 15 bathroom breaks in a 24-hour period.").

As to Carolyn's physical impairments, the ALJ found that Carolyn's osteoarthritis, partial rotator cuff tear of her left shoulder, and cervical degenerative disc disease were severe impairments that significantly limited her capacity for work. (R. 15-16). In the RFC finding, she accounted for these impairments by restricting plaintiff to only light exertional work and including non-exertional limitations to only occasional left upper extremity pushing, pulling, and operating hand controls, occasional overhead reaching with her left (non-dominant) arm, occasional climbing of ladders, ropes, or scaffolds, and occasional crawling. *Id.* at 19. The ALJ acknowledged that imaging studies documented these impairments and additional testing confirmed left shoulder deficits. *Id.* at 20-21. However, as the ALJ noted, Carolyn had minimal deficits on physical exams, which showed mostly normal range of motion, normal gait, no extremity deficits, non-tender joints, no postural deficits, full strength, and no musculoskeletal deficits despite her pain complaints. *Id.* at 20-22. In addition, Carolyn received only routine and conservative ongoing treatment that consisted of over the-counter medication (ibuprofen), and Carolyn did not follow recommendations for occupational therapy. *Id.* After therapy, injections were considered as the next possible step, but Carolyn never progressed to such treatment. *Id.* at 21.

In determining the RFC, the ALJ considered Carolyn's subjective symptom allegations, but found them only partially reliable because the objective findings were minimal, there was no ongoing treatment beyond conservative modalities, and there were no recommendations for surgical intervention. (R. 20, 22, 23). The ALJ adopted the non-exertional restrictions that the reviewing reconsideration state agency physician, Dr. Reynaldo Gotanco, endorsed, but accommodated plaintiff by further restricting her to light exertional work. *Id.* at 22, 24. The ALJ found a contrary opinion from Carolyn's primary care provider, Dr. Oladeinde, unpersuasive

because it was unsupported and inconsistent with the record. *Id*. at 25.[18]  Carolyn does not challenge the reasons the ALJ gave for rejecting Dr. Oladeinde's opinions.  And while Carolyn argues that the findings of imaging studies and medical tests show greater left upper extremity limitations than those in the RFC, Dr. Gotanco considered these findings on reconsideration and found that Carolyn was still capable of performing medium work with occasional left upper extremity pushing/pulling (including operating hand controls) and occasional left upper extremity reaching overhead. Doc. 15 at 12; (R. 100, 105-08).  Contrary to Carolyn's contention, the ALJ was also not required to call a medical expert or order a consultative examination to provide an updated RFC assessment when the record was not inadequate to make a disability determination. 20 C.F.R. § 404.1520b(b)(2); *Jirau v. Astrue*, 715 F. Supp.2d 814, 826 (N.D. Ill. 2010) ("Unless required to develop an inadequate record or resolve ambiguities, the decision to call a medical expert and/or order a consultative examination is within the ALJ's discretion.").  By relying on the state agency physician in finding occasional left overhead reaching, the ALJ did not improperly "determine[e] the significance of particular medical findings" herself as Carolyn also claims. *Lambert*, 896 F.3d at 774.  Given this record, the ALJ adequately articulated her rationale for finding Carolyn had the RFC for light work and that decision is supported by more than a mere scintilla of evidence. *Ramos v. Kijakazi*, 2023 WL 4554539, at *3 (7th Cir. 2023) ("if the ALJ erred at all, she seems to have done so in [claimant's] favor"); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (ALJ's RFC "was more limiting than that of any state agency doctor, [] illustrating reasoned consideration given to the evidence [claimant] presented.").

---

[18]     In March 2020, Dr. Oladeinde opined in part that Carolyn could never lift and carry less than 10 pounds, could not perform any reaching with her left arm, had 50% capacity to reach with her right arm, and had 50% capacity to use her left hand for work tasks. (R. 503).

**D.      Subjective Symptom Assessment**

Finally, Carolyn challenges the ALJ's partially adverse subjective symptom determination. "Subjective statements by claimants as to pain or other symptoms are not alone conclusive evidence of disability and must be supported by other objective evidence." *Grotts,* 27 F.4th at 1278.   Rather, in considering a claimant's subjective symptoms, an ALJ assesses the objective medical evidence and a number of other factors, including the claimant's daily activities, effectiveness and side effects of any medication, treatment, other methods to alleviate symptoms, and factors that precipitate and aggravate pain. SSR 16-3p, 2017 WL 5180304, at *7-8 (Oct. 25, 2017); 20 C.F.R. § 404.1529(c).   "As long as an ALJ gives specific reasons supported by the record, we will not overturn a credibility determination unless it is patently wrong." *Grotts*, 27 F.4th at 1279; *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support.").

Carolyn has not shown that the ALJ's subjective symptom assessment was patently wrong. In concluding that Carolyn's statements about the intensity and severity of her symptoms were not entirely consistent with the medical evidence and other evidence in the record, the ALJ considered: the objective medical evidence, including minimal deficits on physical exams, overall unremarkable mental health exam findings, the consultative psychological exam findings, and the opinion evidence; Carolyn's activities; her testimony about the severity of her pain and other symptoms; her improvement with medication and lack of reported side effects; and her conservative course of treatment for her mental and physical impairments. (R. 16-18, 20-26). Carolyn argues that the results of her left shoulder and cervical spine imaging and Neer and Hawking impingement tests cannot be construed as minimal or mild.  Again, however, Carolyn fails to acknowledge that the state agency physician on reconsideration reviewed the medical findings she cites and determined that she was capable of performing medium work with certain

occasional left upper extremity restrictions. Her lay speculation about the significance of these particular medical findings does not establish that the ALJ's subjective symptom assessment was patently wrong. Moreover, contrary to Carolyn's contention, the ALJ did not disregard the limited abduction of her left should joint in June 2019 and positive Neer and Hawkins impingement tests from October 2019. *See id.* at 20-21. In evaluating Carolyn's symptoms, the ALJ also properly considered Carolyn's noncompliance with recommended occupational therapy. *Id.* at 23; *see* 16-3p, 2017 WL 5180304, at *9 ("if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall record.").

Carolyn states that the ALJ's finding that her panic attack allegations were not documented in the medical record overlooks her documented anxiety symptoms and her panic episodes when driving. But the ALJ acknowledged that Carolyn endorsed anxiety symptoms and considered records documenting her anxiety diagnosis and complaints. The ALJ also specifically considered her 2016-2017 treatment records which cited her panic while driving episodes but correctly noted they were well before the relevant period. (R. 16, 23). Carolyn further claims that the ALJ did not evaluate her daily activity restrictions. Doc. 15 at 15. In fact, the ALJ considered the evidence Carolyn highlights, including that she testified that she spends most of the day in bed, her sister or father come three times a week to do her household chores, she cannot drive due to anxiety and left arm pain, and she has an emotional support dog. (R. 16, 20, 23). The ALJ also considered Carolyn's sister's third-party statement but found it "not particularly helpful in informing the residual functional capacity" and Carolyn does not take issue with the ALJ's reasons for making that finding. *Id.* at 25-26. Because the ALJ's stated reasons for partially rejecting Carolyn's

subjective symptom allegations are adequately explained and supported by the record, the ALJ's assessment of her allegations was not patently wrong.

### III. CONCLUSION

For the reasons stated above, Plaintiff's request for reversal and remand of the ALJ's decision [15] is denied, the Acting Commissioner's request for affirmance [21] is granted, and the ALJ's decision is affirmed.

**SO ORDERED.**

Dated: September 6, 2023

_____
Sunil R. Harjani
United States Magistrate Judge